MARION WOODARD, Administrator, Appellee, v. HERALD PUB-
LISHING HOUSE, Appellant.

**MASTER AND SERVANT:** The Relation—Implied Contract of Employment—Acquiescence. The relation of master and servant may result from the act of the master in acquiescing in the good-faith rendition of services for the master by another without any express contract of employment.

PRINCIPLE APPLIED: Deceased had been working for the employer some weeks prior to his death. The construction of a cement floor to an ice house was under way. When another branch of the work was taken up, deceased became dissatisfied with the wages and left. A week later, he returned and asked for work at the reduced wages. The sub-foreman, who was in apparent charge of the work, but who had no authority to employ help, urged deceased to go to work, and told deceased he would speak to the general superintendent, as soon as he came, about the matter. The superintendent, who had full control of the work, soon came, saw deceased at work, and voiced no objections. The sub-foreman did not speak to the superintendent, because he did not see him. Shortly after the superintendent arrived, deceased was killed. *Held*, the record supported a finding that the relation of master and servant existed.

**NEGLIGENCE:** Acts Constituting Negligence—Exposed Electric Wires—Contributory Negligence. Evidence reviewed, and held to support a finding that a master was negligent in maintaining heavily charged electric wires in the immediate vicinity of workmen, who did not know of the extreme and attendant danger, and likewise that the servant was not guilty of contributory negligence in the acts resulting in his death.

**NEGLIGENCE:** Assumption of Risk—Master's Negligence. A servant does not assume the risk of the master's negligence when he has no knowledge of such negligence. So held where the master negligently exposed high voltage electric wires.

**TRIAL:** Verdict—$5,000—Excessiveness. Verdict of $5,000, re-

duced by the trial court to $3,000, for the death of a common laborer, 48 years of age, without much accumulation of property, held not excessive.

*Appeal from Decatur District Court.*—THOS. L. MAXWELL, Judge.

NOVEMBER 17, 1917.

ACTION at law by plaintiff, as administrator of the estate of W. W. Johnson, deceased, for damages caused by the alleged negligence of the defendant. There was a trial to a jury, and a verdict for plaintiff for $5,000; but the trial court required plaintiff to remit $2,000 or submit to a new trial. The remittitur was made, and judgment entered for $3,000. The defendant appeals.—*Affirmed.*

*Cummins, Hume & Bradshaw* and *V. R. McGinnis,* for appellant.

*C. W. Hoffman* and *R. L. Parrish,* for appellee.

PRESTON, J.—It is alleged, substantially, that defendant is engaged in the business of operating an electric light plant; that the wires run from the power house out over the top of an ordinary door to a small tree near the door; that they also connected the power house with another wire, that led from near the door of the old power house into the new power house, and permitted a wire to lie upon the ground just east of the new power house; that the wires over the door were only about 6½ feet from the ground, and were not properly covered or protected, so that defendant's workmen were compelled, when entering and leaving the buildings, to pass under said wire, and over the wire that was loose on the ground; that said wires were carelessly placed, and were in such condition as to endanger the lives of defendant's employes; that, on July 9, 1913, deceased was employed in assisting in laying a cement floor in defendant's west building; that in the discharge of

his duties he was mixing and carrying cement under said overhead wires, and, without knowing the dangerous character thereof, he picked up a loose wire to move the same out of his way; that, just prior to the time he picked up said wire, a current of electricity was turned on said overhead wires; that, without knowledge thereof, and without any warning of the dangerous character of the same, he placed or attempted to throw said wire, so picked up, on or over the overhead wires, and was instantly killed by the electric current from said wires.

The grounds of negligence are: Placing the wires so nearly over the heads of the workmen; placing the other wires where their workmen were compelled to walk over and remove them; not having the wires overhead properly guarded and protected; not having a danger sign to warn employes of the dangerous character of said wires; turning on a deadly current of electricity while deceased was working under said wires; not warning deceased of the danger to which he was subjected.

The answer denies, and alleges that it was erecting an ice plant in connection with its electric system, also a new smokestack and boiler room in connection therewith; that, in making the improvements, it was necessary to take down their motor wires from their permanent position and lower them; that the only wire that was movable was a light wire to the interior of the ice plant, whch light wire was safe; that the main wires bearing the current from the power plant to the main line were properly insulated, so that, under ordinary circumstances, there was no danger from them; that deceased had worked in and about the premises at a time prior to his death, and had been warned of the danger, especially when the ground was wet; that deceased was not in the employ of the defendants by any authority, but was assisting in said work at the request of another employe; that deceased removed the mortar box from a point

some distance from the wires to a point under them; that he used a barrel of water near his work, and made the location wet and dangerous; that deceased negligently, and knowing the danger, picked up the light wire and undertook to put it over the main motor wires, and at the same time was warned by those present not to do so, which warning he disregarded; that, by reason of his contact with the main wires, under the conditions stated, the electric current passed from the wires to his body, and thus caused his death; and that his death was caused wholly by his own negligence. It was conceded on the trial that the wires running out of the building were, at the time of the death of deceased, charged with 2,200 volts. The defendant moved for a directed verdict at the close of plaintiff's testimony, and again at the close of all the evidence. The motions were overruled, and the cause submitted to the jury.

1. MASTER AND SERVANT: the relation: implied contract of employment: acquiescence.

1. It is strongly urged by appellant that deceased was not, at the time of his injury, in the employ of the defendant, and that the relation of master and servant did not exist, and it contends that the deceased was a mere interloper and trespasser. Appellee contends that the employment of deceased was by Fowler, who was in apparent charge of the work, and further that, after his employment by Fowler, the company, by its superintendent, Gilbert, who was in charge of the work, and who had authority to employ and discharge men, saw deceased at work and acquiesced therein. The trial court did not instruct as to appellee's first contention, but did instruct on the theory of acquiescence, and for this reason appellee says that the instructions were more favorable to appellant than it was entitled to, and that the court should have instructed on the other theory as well. But plaintiff has not appealed, and only asks a determination of that question in case

there is a reversal on other grounds.  The point as to ac-
quiescence is argued more elaborately than the others, and
is evidently the point most seriously relied upon for a re-
versal.

It 'appears from the evidence that, at the time of 'the
accident, defendant was putting a cement floor in the ice
plant, and they had been working at this building for about
a month.  Deceased had, during that time, helped mold
the cement blocks and attended the masons.  Deceased had
quit about a week before, because, when he went to work
on the building, he wanted $2.50 per day, the same wages
that he had been getting while making blocks, but the su-
perintendent would not pay more than the other men were
getting, $2 a day.  The day he was killed, he came back
to work, and wanted Fowler to speak to Gilbert, the super-
intendent, about going to work again, and was willing to
work for $2.  It was getting quite late, and Fowler saw
he was going to be late, and told deceased he wished he
would go to work and help him, so as to get through ear-
lier.  Gilbert, at that time, about 2:30 o'clock in the after-
noon, according to some of the testimony, was temporarily
absent.  Deceased went to work when Fowler asked him to.
Fowler asked him to go to work at once, and said he would
speak to Gilbert when he came around.  Deceased complied
with Fowler's request, mixing mortar, and was so work-
ing when he was killed.  Fowler had not seen Gilbert to
speak to him before Johnson lost his life.  Gilbert re-
turned in an hour or so, and noticed deceased working there
as soon as he came up, and was familiar with the conditions
and the situation.  Gilbert made no objection to deceased's
working there, but gives no reason why he did not do so.
The superintendent says that, when he came up, Johnson
was almost directly under the place where they were rais-
ing sheets, building the smokestack; and he did not con-
sider it a safe place for him to work.  It is shown that Gil-

bert had full control and charge of the work, and his duties were to superintend the building, look after the men, their time, and instruct them in their work.

The court, in Instruction No. 3, after stating that plaintiff must show that the relation of master and servant existed at the time of the accident, and that this can only be created by contract, either express or implied, said that the evidence failed to show any express contract by anyone authorized, and that, therefore, the only question submitted, with reference to the employment, was as to whether or not there was an implied contract of employment, and continued:

"If you find from the evidence that said Johnson had been an employe of the defendants in and about said building improvements shown by the evidence for some months, and up to a week or two prior to the accident, and that at that time was offered further employment, at a reduced wage, but refused to continue in said employment on that account, and you further find that, on the day of the accident, deceased called at the premises where the work was going on, and was offered and was ready to take up said employment at said reduced wage, but that said offer was made to Mr. Fowler, an employe of defendants', who had no authority to employ servants, but, notwithstanding such fact, said Fowler directed said Johnson to go to work and assist him in the work in which he was engaged, and that he, Fowler, would thereafter speak to the superintendent about such employment when he should return to the place where such work was going on, and you further find from the evidence that said Johnson in good faith acted upon said direction, believing that, when said superintendent returned, he would approve the act of said Fowler, and so believing, entered upon said work, and assisted said Fowler in carrying on the same, and that thereafter, the superintendent, Mr. Gilbert, did return to the place where said

work was being done, and saw said Johnson there engaged in said work, and you further find that said Gilbert knew and understood, or had reasonable time and opportunity to know and understand, that said Johnson was there at .work for the defendants at the request and direction of Fowler, and made no objection thereto, and acquiesced therein, then you would be justified in finding that said Johnson was an employe of the defendants', and that the relation of master and servant existed between the defendants and said Johnson at the time the accident occurred which resulted in his death. But if you fail to so find, you would not be justified in finding that the relation of master and servant existed between said parties at said time."

It was a question for the jury to say whether, from all the circumstances, the superintendent knew and understood, or had reasonable time and opportunity to know and understand, that deceased was there at work for the defendant. No objection is made to the form of the instruction, or that it does not correctly recite the circumstances, nor is it objected that it does not state the law correctly as an abstract proposition, under the Iowa authorities; but it is contended that the evidence does not show acquiescence.

Counsel for appellant have been industrious in the citation of authority, and cite many cases from other jurisdictions, and some of the Iowa cases are relied upon by both parties. But our own cases recognize that there is a conflict in the decisions, and that our own cases are not entirely in harmony with those of other jurisdictions, especially as to the authority of a servant in apparent charge of the work to employ another to assist. Both parties cite the recent cases of *Aga v. Harbach*, 127 Iowa 144, and *Hitchcock v. Arctic Creamery Co.*, 170 Iowa 352, and quote extensively from both. These cases are well considered, and many of the cases are cited and discussed therein. The

trial court attempted to, and we think did, follow them, and correctly stated the law in the instruction set out, and the evidence was sufficient to take the case to the jury on the doctrine of acquiescence. We shall not take the time or space to restate the reasoning in the cases cited.

It certainly cannot be claimed that, under the record in the instant case, deceased was a mere trespasser or intermeddler, and that he officiously interfered with and undertook to perform the services without request or employment, and that he did not in good faith enter upon the employer's work,—at least it was a question for the jury.

2. As to the defendant's negligence, it

2. NEGLIGENCE:
acts constitu-
ting negli-
gence: exposed
electric wires:
contributory
negligence.

is not quite clear just how the deceased was injured, as no one appears to have been noticing at the particular time. Plaintiff's theory is that deceased picked up the wire on the ground to throw it out of his way, and threw it over the other wires, while it is the contention of defendant that deceased took hold of the wires. There is evidence that the overhead wires were spliced at the point where deceased was injured, and that they were not properly taped or covered. What we have before said indicates the general situation. We shall not go into the evidence.

Taking into consideration the location of the wires and their dangerous character, as the jury could have found, whether the wires were properly spliced and taped, and all the circumstances shown in the record, we think it was a question for the jury to say whether defendant was or was not negligent. So, too, as to the alleged contributory negligence of the deceased. It is true that he had worked about the plant before, and there is evidence tending to show that the men had been told, some weeks before, in the presence of deceased, as to the danger in regard to the wires, but at other places and under other circum-

stances. Just how much deceased heard or understood of this prior admonition is not shown. And he doubtless did know in a general way of the danger from wires with a high voltage; yet we may assume that there is not much knowledge among ordinary laymen in regard to electricity. Deceased was a common laborer, and is not shown to have had special knowledge of electricity, or of the condition as affecting these particular wires at the time of the accident, or of their dangerous condition, due to moisture or defective splicing; so that there are some matters in regard to the situation at the time he was hurt that he did not know, —at least the jury could have so found. A witness for the defendant testifies that he said to deceased, while deceased was in the act of raising the wire from the ground, "Don't do that;" but this is disputed by witnesses for the plaintiff. Whether deceased was so warned, and, if so, whether he heard or understood, and whether the alleged warning preceded or was simultaneous with the accident, is uncertain; and, the evidence being in conflict, it was a question for the jury.

3. There is evidence that, after deceased began work in the afternoon of his death, he moved the mortar box from another point to the place where he was working, where the wires were lower. On this branch of the case, the court instructed as follows:

"No 8A. If you find from the evidence that, on the day of the accident when Johnson was requested and directed by Fowler to assist in said work, that the mortar box used in mixing the mortar at which Johnson was to work was then located at a point near the sand pile and cottonwood tree, where the motor wires which caused the death of said Johnson were secured to said cottonwood tree, at an elevation of twelve feet or more from the ground, and you further find that, when Johnson commenced working, mixing and carrying the mortar to Fowler, he, with-

out any authority or direction from the defendants, or their superintendent, moved said mortar box to a point near the boiler room door, where said wires were elevated only to an extent of six or seven feet above the ground, and said Johnson placed said mortar box, without such authority, directly under said wires, and there made a place for himself to work, with knowledge or previous warning of the dangerous character of said wires, and by reason of the fact that said Johnson moved said mortar box and made a place for himself to work in said dangerous situation, he thereby came in contact with said wires, as shown by the evidence, and was there killed, this would constitute such contributory negligence on the part of Johnson, notwithstanding any negligence of the defendants, that the plaintiff could not recover in this action, and your verdict, if you so find, should be for the defendants."

The complaint made in regard to this matter is that the instruction is the law of the case, and that the finding of the jury is contrary to this instruction; but this assumes and is on the theory, as we understand appellant, that deceased had knowledge and previous warning of the dangerous character of the wires. We have already indicated that these were questions for the jury.

4. It is thought by appellant that deceased assumed the risk. But if the defendant was negligent in the particulars charged, as the jury could and must have found, then the risks from such negligence would not be such as are incident to the business.

3. NEGLIGENCE: assumption of risk: master's negligence.

5. It is contended that the damages are excessive, and indicate passion and prejudice of the jury. It is a difficult proposition for a jury or anyone else to determine with any degree of accuracy just what the damages

4. TRIAL: verdict: $5,000: excessiveness.

should be in such a case. We have often said that it is a matter largely within the discretion of the jury. Deceased was a common laborer, about 48 years of age, and had not accumulated any considerable amount of property. We think the verdict as originally returned was not so grossly excessive as to indicate passion and prejudice, and that, the court having required a reduction of $2,000, the judgment should stand. There may be other questions of minor importance discussed, but those we have referred to are controlling. We discover no reversible error, and the judgment is, therefore,—*Affirmed.*

GAYNOR, C. J., WEAVER and STEVENS, JJ., concur.